# CABANA, SUPERINTENDENT, MISSISSIPPI STATE PENITENTIARY, ET AL. *v.* BULLOCK

No. 84–1236.   Argued November 5, 1985—Decided January 22, 1986

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 392. BRENNAN, J., filed a dissenting opinion, *post*, p. 393. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 394. STEVENS, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 407.

*Marvin L. White, Jr.*, Special Assistant Attorney General of Mississippi, argued the cause for petitioners. With him on the brief were *Edwin Lloyd Pittman*, Attorney General, *Amy D. Whitten*, Special Assistant Attorney General, and *William S. Boyd III.*

*Joseph T. McLaughlin* argued the cause for respondent. With him on the briefs were *Henry Weisburg* and *Daniel Levin.**

JUSTICE WHITE delivered the opinion of the Court.

In *Enmund* v. *Florida*, 458 U. S. 782 (1982), we ruled that the Eighth Amendment forbids the imposition of the death penalty on "one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.*, at 797. This case requires us to determine in whose hands the decision that a defendant possesses the requisite degree of culpability properly lies.

---

*Michael J. Bowers*, Attorney General of Georgia, *Marion O. Gordon*, First Assistant Attorney General, *William B. Hill, Jr.*, Senior Assistant Attorney General, *Mary Beth Westmoreland*, Assistant Attorney General, *Jim Smith*, Attorney General of Florida, *Linley E. Pearson*, Attorney General of Indiana, and *Archie G. McClintock*, Attorney General of Wyoming, filed a brief for the State of Georgia et al. as *amici curiae* urging reversal.

*Robert Glass* and *Timothy K. Ford* filed a brief for the National Association of Criminal Lawyers as *amicus curiae*.

## I

Early in the morning of September 22, 1978, respondent Crawford Bullock and his friend Ricky Tucker accepted Mark Dickson's offer of a ride home from a bar in Jackson, Mississippi. During the course of the ride, Tucker and Dickson began to argue about some money Dickson supposedly owed Tucker. The argument became a fight: Dickson stopped the car, and Dickson and Tucker exchanged blows. Bullock attempted to grab Dickson, but Dickson eluded his grasp and fled from the car. Tucker gave chase and succeeded in tackling Dickson, while Bullock, who had a cast on his leg, followed more slowly. When Bullock caught up with the struggling men, he held Dickson's head as Tucker struck Dickson in the face with a whiskey bottle. Tucker then pummeled Dickson with his fists until Dickson fell to the ground. As Dickson lay helpless, Tucker killed him by smashing his skull with repeated blows from a concrete block. Bullock and Tucker together disposed of Dickson's body, and Bullock kept Dickson's car for himself. Bullock was arrested the next day when police spotted him driving the car. Under questioning at the police station, he confessed to his participation in the course of events just described.

Bullock was charged with capital murder under a Mississippi statute that provided that "[t]he killing of a human being without the authority of law by any means or in any manner shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . or in any attempt to commit such." Miss. Code Ann. § 97–3–19(2)(e) (Supp. 1985). Under Mississippi law, a participant in a robbery could be convicted of capital murder under the statute for a murder committed in the course of the robbery by an accomplice notwithstanding the defendant's own lack of intent that any killing take place, for "[i]t is . . . familiar law that when two or more persons act in concert, with a common design, in committing a crime of violence upon others, and a

homicide committed by one of them is incident to the execution of the common design, both are criminally liable for the homicide." *Price* v. *State*, 362 So. 2d 204, 205 (Miss. 1978). In accordance with this doctrine of accomplice liability, the court instructed the jury at the conclusion of the guilt phase of Bullock's trial as follows:

"The Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt that on September 21, 1978, in the First Judicial District of Hinds County, Mississippi, Crawford Bullock, Jr., was present, consented to, and encouraged the commission of a crime and thereby *aided* another individual, and that he, the said Crawford Bullock, Jr., or the other, then and there did wilfully, unlawfully and feloniously take and carry away the personal property of another from the presence of Mark Dickson, and from his person, against his will, by violence to his person, to-wit *[sic]*; his billfold or one 1978 Thunderbird automobile then in his possession, then and in that event, the Defendant, Crawford Bullock, Jr. is guilty of robbery as if he had with his own hands committed the whole offense; and, if the Jury further finds from the evidence in this case, beyond a reasonable doubt, that on said date aforesaid, while engaged in the commission of the aforesaid robbery, if any, that the said Crawford Bullock, Jr., did alone, or while acting in consert *[sic]* with another, while present at said time and place by consenting to the killing of the said, Mark Dickson, and that the said Crawford Bullock, Jr., did any overt act which was immediately connected with or leading to its commission, without authority of law, and not in necessary self defense, by any means, in any manner, whether done with or without any design to effect the death of the said Mark Dickson, that the[n], and in that event, the said Crawford Bullock, Jr., is guilty of capital murder." App. 87–89.

The jury found Bullock guilty of capital murder. Following a separate sentencing hearing, the jury found that two statutory aggravating circumstances were present and that they were not outweighed by any mitigating circumstances. Accordingly, the jury sentenced Bullock to death.

On appeal to the Mississippi Supreme Court, Bullock argued, *inter alia*, that the evidence was insufficient as a matter of law to allow submission of the capital murder charge to the jury and that the imposition of the death penalty on him would be so disproportionate to his level of involvement in the crime as to violate the Eighth Amendment. The court rejected both contentions. *Bullock* v. *State*, 391 So. 2d 601 (1980), cert. denied, 452 U. S. 931 (1981). The court ruled that the verdict of capital murder was sustainable in view of the "overwhelming" evidence "that [Bullock] was present, aiding and assisting in the assault upon, and slaying of, Dickson . . . and in the taking of the T-bird automobile, which was in the lawful possession and use of Dickson." 391 So. 2d, at 606. With respect to Bullock's claim that the punishment of death was disproportionate to his degree of culpability, the court noted that "[t]he law is well settled in this state that any person who is present, aiding and abetting another in the commission of a crime, is equally guilty with the principal offender." Because Bullock was "an active participant in the assault and homicide committed upon Mark Dickson," the court concluded that the punishment was not disproportionate to his guilt. *Id.*, at 614.

After exhausting state postconviction remedies, Bullock filed a petition for writ of habeas corpus in the United States District Court for the Southern District of Mississippi. The District Court denied the writ, but the Court of Appeals for the Fifth Circuit reversed on the ground that Bullock's death sentence was invalid under our decision in *Enmund*, which was handed down during the pendency of the District Court proceedings. *Bullock* v. *Lucas*, 743 F. 2d 244 (1984). The

court based this conclusion solely upon its reading of the jury instructions given at Bullock's trial. The court reasoned that under the instructions offered at the guilt phase and quoted in pertinent part above, the jury could have found Bullock guilty of capital murder solely on the basis of his participation in a robbery in which he had aided and abetted someone else who had killed: the instructions did not require a finding of any intent to kill on Bullock's part, nor did they require the jury to find that Bullock had actually killed. In addition, the court noted that the instructions offered the jury at the sentencing phase nowhere required the jury to make any further findings regarding Bullock's personal involvement in the killing. Thus, it was quite possible that the jury had sentenced Bullock to death without ever finding that he had killed, attempted to kill, or intended to kill. In the court's view, *Enmund* prohibited execution of a defendant absent such findings by the trier of fact; accordingly, the court granted a writ of habeas corpus vacating Bullock's death sentence, but permitting the State, "at its option, to either impose a sentence of life imprisonment or, within a reasonable period of time, conduct a new sentencing hearing" at which with the proper findings a death sentence could be reimposed. 743 F. 2d, at 248.

Because the Fifth Circuit's holding that *Enmund* can be satisfied only by findings made at the guilt-innocence or sentencing phase of a trial (see also *Reddix* v. *Thigpen*, 728 F. 2d 705 (CA5 1984)) conflicts with the interpretation of *Enmund* adopted by the Eleventh Circuit, see *Ross* v. *Kemp*, 756 F. 2d 1483 (1985),[1] we granted certiorari, 471 U. S. 1052 (1985).

---

[1] Under the interpretation of *Enmund* adopted by the Eleventh Circuit in *Ross*, a jury finding that the defendant possesses the requisite culpability is not required by the Eighth Amendment. 756 F. 2d, at 1488. In the absence of such a finding, *Ross* holds, the Eighth Amendment requires no more than that a federal habeas corpus court conduct an independent review of the record to determine whether the defendant's "level of individual participation . . . justifies the application of the death penalty." *Id.*, at 1489. We agree that if the federal court made the *Enmund* finding, the

## II

The Court of Appeals was correct in concluding that neither the jury's verdict of guilt nor its imposition of the death sentence necessarily reflects a finding that Bullock killed, attempted to kill, or intended to kill.  The jury instructions at the guilt phase were, to say the least, confusing, and they do not lend themselves easily to any particular interpretation. A fair-minded juror, however, could have understood them to mean that the jury could find Bullock guilty of capital murder without regard to his intent and solely by virtue of his having aided his accomplice at some point in the assault that led to the killing.[2]  This interpretation of the instructions is but-

_____

Eighth Amendment would be satisfied, but as will appear, we hold that the state courts should be given the opportunity to address the matter in the first instance.

[2] An instruction offered after the one quoted *supra,* at 380, informed the jury that to find Bullock guilty of capital murder, it must find that he "did in fact kill Mark Dickson without malice, without authority of law, and not in necessary self defense."  App. 90–91.  This instruction does not change our view that the jury's verdict does not necessarily reflect a finding that Bullock killed.  The preceding instruction had explicitly informed the jury that it could find Bullock guilty if his accomplice had done the actual killing. The jury could well have concluded, reading the instructions together, that the instruction that Bullock must have "in fact killed" referred only to a requirement that Bullock have committed acts that rendered him legally accountable for the killing under the previous instruction.   Under this reading of the instructions, the earlier, more specific instruction would be read as defining the legal meaning of the requirement that Bullock must have "in fact killed."

Even if the second instruction is read as simply irreconcilable with the first, however, we cannot conclude that the jury followed the second instruction.   As was the case last Term in *Francis* v. *Franklin,* 471 U. S. 307, 322 (1985), "[n]othing in these specific sentences or in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other.   Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity.   A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict."   Moreover, to the extent that one can speculate as to which of the

tressed, as Judge Garwood pointed out in his concurring opinion below, by the fact that "the entire case was essentially tried on the theory, in full accordance with the then law of Mississippi, that it was not necessary, either for the felony murder conviction or for the sentence to death, to find that Bullock had either the intent to kill or any personal participation in the killing." 743 F. 2d, at 248. Thus, the jury may well have sentenced Bullock to death despite concluding that he had neither killed nor intended to kill; or it may have reached its decision without ever coming to any conclusion whatever on those questions.

## III

But the conclusion that the jury may not have found that the defendant killed, attempted to kill, or intended that a killing take place or that lethal force be employed does not end the inquiry into whether *Enmund* bars the death sentence; rather, it is only the first step. In focusing only on the jury instructions—and in requiring a new sentencing hearing before a jury before the death penalty might be reimposed—the Fifth Circuit apparently proceeded upon the premise that *Enmund* can be satisfied only at a sentencing hearing and by a jury's decision (presumably based upon proof beyond reasonable doubt) that the defendant possessed the requisite culpability. Examination of the nature of our ruling in *Enmund* reveals that this premise is erroneous.

A defendant charged with a serious crime has the right to have a jury determine his guilt or innocence, *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), and a jury's verdict cannot stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof, *Sandstrom* v. *Montana,* 442 U. S. 510 (1979). Findings

---

instructions the jurors followed in this case, it seems more likely that they would have chosen the earlier instruction, which, though somewhat harder to follow, appears to be more comprehensive and more specifically tied to the facts presented to the jury.

made by a judge cannot cure deficiencies in the jury's finding as to the guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the crime. See *Connecticut* v. *Johnson*, 460 U. S. 73, 95, and n. 3 (1983) (POWELL, J., dissenting); cf. *Beck* v. *Alabama*, 447 U. S. 625, 645 (1980); *Presnell* v. *Georgia*, 439 U. S. 14 (1978); *id.*, at 22 (POWELL, J., dissenting). But our ruling in *Enmund* does not concern the guilt or innocence of the defendant—it establishes no new elements of the crime of murder that must be found by the jury. Rather, as the Fifth Circuit itself has recognized, *Enmund* "does not affect the state's definition of any substantive offense, even a capital offense." *Reddix* v. *Thigpen*, 728 F. 2d, at 709; see also *Enmund*, 458 U. S., at 810, n. 19 (O'CONNOR, J., dissenting). *Enmund* holds only that the principles of proportionality embodied in the Eighth Amendment bar imposition of the death penalty upon a class of persons who may nonetheless be guilty of the crime of capital murder as defined by state law: that is, the class of murderers who did not themselves kill, attempt to kill, or intend to kill.[3]

The decision whether a particular punishment—even the death penalty—is appropriate in any given case is not one that we have ever required to be made by a jury. Indeed, in *Spaziano* v. *Florida*, 468 U. S. 447 (1984), we specifically rejected the argument that the Sixth Amendment or any other constitutional provision provides a defendant with the right

---

[3] We are unable to understand JUSTICE BLACKMUN's statement that we have failed to grasp "the distinction . . . between defining an offense and being entitled to execute a defendant." *Post*, at 403. As stated in the text, we recognize that there is a class of persons whom the State may define as having committed capital murder but whom the State may not permissibly execute. The point we are making, however, is that while the Eighth Amendment prohibits the execution of such defendants, it does not supply a new element of the crime of capital murder that must be found by the jury; hence, such cases as *Cole* v. *Arkansas*, 333 U. S. 196 (1948), which hold that the inadequacy of a jury's findings on the issue of guilt or innocence may not be corrected by an appellate court, are inapposite.

to have a jury consider the appropriateness of a capital sentence. Moreover, the decision whether a sentence is so disproportionate as to violate the Eighth Amendment in any particular case, like other questions bearing on whether a criminal defendant's constitutional rights have been violated, has long been viewed as one that a trial judge or an appellate court is fully competent to make. See, *e. g., Solem* v. *Helm*, 463 U. S. 277 (1983); *Weems* v. *United States*, 217 U. S. 349 (1910).

The determination whether the death sentence is permissible under *Enmund* is different in a significant respect both from the general exercise of sentencing discretion and from the type of Eighth Amendment proportionality inquiry undertaken in *Solem* v. *Helm*. The latter two determinations typically involve case-by-case, totality-of-the-circumstances decisionmaking. *Enmund*, by contrast, imposes a categorical rule: a person who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used may not be sentenced to death. Nonetheless, the rule remains a substantive limitation on sentencing, and like other such limits it need not be enforced by the jury.

Indeed, *Enmund* does not impose *any* particular form of procedure upon the States. The Eighth Amendment is satisfied so long as the death penalty is not imposed upon a person ineligible under *Enmund* for such punishment. If a person sentenced to death in fact killed, attempted to kill, or intended to kill, the Eighth Amendment itself is not violated by his or her execution regardless of who makes the determination of the requisite culpability; by the same token, if a person sentenced to death lacks the requisite culpability, the Eighth Amendment violation can be adequately remedied by any court that has the power to find the facts and vacate the sentence. At what precise point in its criminal process a State chooses to make the *Enmund* determination is of little concern from the standpoint of the Constitution. The State has considerable freedom to structure its capital sentencing

system as it sees fit, for "[a]s the Court has several times made clear, we are unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." *Spaziano, supra,* at 464; see also *Pulley* v. *Harris,* 465 U. S. 37 (1984); *Zant* v. *Stephens,* 462 U. S. 862 (1983); *Gregg* v. *Georgia,* 428 U. S. 153, 195 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.).

Accordingly, when a federal habeas court reviews a claim that the death penalty has been imposed on one who has neither killed, attempted to kill, nor intended that a killing take place or lethal force be used, the court's inquiry cannot be limited to an examination of jury instructions. Rather, the court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made.[4] If

---

[4]JUSTICE BLACKMUN's reliance on *Hicks* v. *Oklahoma,* 447 U. S. 343 (1980), and *Presnell* v. *Georgia,* 439 U. S. 14 (1978), for the proposition that state appellate courts may not supply essential findings that the jury has omitted is, as applied in this case, misguided. In *Hicks,* we held only that where state law creates for the defendant a liberty interest in having the jury make particular findings, the Due Process Clause implies that appellate findings do not suffice to protect that entitlement. Unlike the defendant in *Hicks,* Bullock had no state-law entitlement at the time of his trial to have the jury (or, indeed, anyone at all) make the *Enmund* findings. Of course, federal law, as later established by *Enmund,* does entitle Bullock to a determination whether he killed, attempted to kill, intended to kill, or intended that lethal force be used; but, for the reasons explained in the text, the federal-law entitlement, unlike the state-law entitlement involved in *Hicks,* does not specify who must make the findings.

In *Presnell,* the defendant was convicted on charges of murder and kidnaping with bodily injury, and was sentenced to death by the jury. The sole aggravating factor supporting the death penalty for murder was that the defendant was also guilty of kidnaping with bodily injury. The Georgia Supreme Court found that the jury had been wrongly instructed on the elements of kidnaping with bodily injury, but affirmed both the conviction for that crime and the use of the crime as an aggravating factor on the ground that the evidence was sufficient to support the jury's findings under a theory on which the jury had not been instructed. We set aside both the

it has, the finding must be presumed correct by virtue of 28 U. S. C. § 2254(d), see *Sumner* v. *Mata*, 449 U. S. 539 (1981), and unless the habeas petitioner can bear the heavy burden of overcoming the presumption, the court is obliged to hold that the Eighth Amendment as interpreted in *Enmund* is not offended by the death sentence.[5]

conviction and the death sentence on the authority of *Cole* v. *Arkansas*, 333 U. S. 196 (1948), which held that it was constitutional error for a state court to affirm a conviction for one offense on the basis of evidence in the record indicating that the defendant had committed another offense on which the jury had not been instructed. Insofar as it merely applied *Cole* in setting aside the defendant's conviction for kidnaping with bodily injury, *Presnell* is unremarkable and has little to do with this case. See n. 3, *supra*. But in reversing as well the death sentence on the ground that the Georgia Supreme Court could not find an aggravating factor on a theory on which the jury had not been instructed, the *Presnell* Court appeared to assume that the jury's constitutional role in determining sentence was equivalent to its role in determining guilt or innocence. This assumption, of course, is no longer tenable in light of our holding in *Spaziano* v. *Florida*, 468 U. S. 447 (1984).

[5] *Sumner*, of course, establishes that the presumption applies to facts found by appellate as well as trial courts. 449 U. S., at 545–547. There might be instances, however, in which the presumption would not apply to appellate factfinding regarding the *Enmund* criteria because appellate factfinding procedures were not "adequate," see 28 U. S. C. § 2254(d)(2). For example, the question whether the defendant killed, attempted to kill, or intended to kill might in a given case turn on credibility determinations that could not be accurately made by an appellate court on the basis of a paper record, cf. *Anderson* v. *Bessemer City*, 470 U. S. 564, 575 (1985); *Wainwright* v. *Witt*, 469 U. S. 412, 429 (1985). The possibility that such cases falling within the § 2254(d)(2) exception may exist, however, does not excuse the habeas court of its obligation to examine the entire state process to determine whether the *Enmund* findings have been made, for it is by no means apparent that appellate factfinding will always be inadequate. For example, in some cases it may be possible to determine the *Enmund* issue adversely to the defendant even if credibility issues and other ambiguities in the record are resolved in his or her favor. See, *e. g.*, *Ross* v. *Kemp*, 756 F. 2d 1483, 1488–1490 (CA11 1985). We shall not now attempt to determine what factfinding procedures would be adequate in the particular case before us, for, as we shall see, the state courts have not yet purported

## IV

The Court of Appeals thus erred in focusing exclusively on the jury and in ordering a new sentencing hearing without inquiring whether the necessary finding of intent had been made by the trial court or by the state appellate court. The State argues that the Mississippi Supreme Court itself made a finding sufficient to satisfy *Enmund* in the course of its direct review of Bullock's conviction and sentence. It relies on two separate statements in the court's opinion. First, in responding to the claim of insufficient evidence, the court said that "[t]he evidence is overwhelming that appellant was present, aiding and assisting in the assault upon, and slaying of, Dickson." 391 So. 2d, at 606. Second, in determining that the death penalty was not disproportionate to the sentences imposed in other cases, the court stated that "[t]he evidence is overwhelming that appellant was an active participant in the assault and homicide committed upon Mark Dickson." *Id.*, at 614.

We are very doubtful, however, that these assessments of the record were sufficient in themselves to constitute a finding that Bullock killed, attempted to kill, or intended to kill Dickson. The Mississippi Supreme Court obviously was not addressing the specific requirements set forth in *Enmund*, for that case had not yet been decided. Rather, the court's remarks are better read as stating the court's conclusion that Bullock's participation in the assault and robbery were sufficient to make him liable for the murder and deserving of the death penalty in light of Mississippi law under which one who takes some overt act in aid of an assault that leads to a killing by his accomplice is equally responsible with the accomplice for the killing. Indeed, immediately before its statement with respect to proportionality, the court said that "[t]he law is well settled in this state that any person who is present,

---

to engage in the requisite factfinding, and we decline to decide the hypothetical question of the adequacy of that which has not yet occurred.

aiding and abetting another in the commission of a crime, is equally guilty with the principal offender." 391 So. 2d, at 614. In other words, the Mississippi court's statements represent at most a finding that, as the District Court put it, Bullock *"by legal definition actually killed."* App. to Pet. for Cert. A30–A31 (emphasis added). Such a finding does not satisfy *Enmund*, for *Enmund* holds that the Eighth Amendment does more than require that a death-sentenced defendant be legally responsible for a killing as a matter of state law; it requires that he himself have actually killed, attempted to kill, or intended that lethal force be used.

## V

There remains the question of the appropriate course of action for a federal court faced with a petition for habeas corpus raising an *Enmund* claim when the state courts have failed to make any finding regarding the *Enmund* criteria. Two possibilities come immediately to mind. The federal court could itself make the factual determination whether the defendant killed, attempted to kill, or intended to kill, and either grant or deny the writ depending on the outcome of that inquiry. Alternatively, the federal court could take steps to require the State's own judicial system to make the factual findings in the first instance. Such findings would, of course, be presumptively correct as a result of 28 U. S. C. § 2254(d) in any subsequent federal habeas proceedings.

Either alternative would, in theory, be adequate to remedy any hypothesized Eighth Amendment violation, for either approach would prevent the execution of any defendant who did not in fact kill, attempt to kill, or intend the use of lethal force. We believe, however, that the second course of action is the sounder one. Two considerations underlie this conclusion. First, to the extent that *Enmund* recognizes that a defendant has a right not to face the death penalty absent a particular factual predicate, it also implies that the State's judicial process leading to the imposition of the death penalty

must at *some* point provide for a finding of that factual predicate. Accordingly, Bullock "is entitled to a determination [of the issue] in the state courts in accordance with valid state procedures." *Jackson* v. *Denno*, 378 U. S. 368, 393 (1964). Second, the State itself has "a weighty interest in having valid federal constitutional criteria applied in the administration of its criminal law by its own courts." *Rogers* v. *Richmond*, 365 U. S. 534, 548 (1961). Considerations of federalism and comity counsel respect for the ability of state courts to carry out their role as the primary protectors of the rights of criminal defendants, see *Younger* v. *Harris*, 401 U. S. 37 (1971); these same considerations indicate the appropriateness of allowing the Mississippi courts an opportunity to carry out in the first instance the factual inquiry called for by *Enmund*. To paraphrase our opinion in *Jackson* v. *Denno*, *supra*, at 393–394, it is Mississippi, therefore, not the federal habeas corpus court, which should first provide Bullock with that which he has not yet had and to which he is constitutionally entitled—a reliable determination as to whether he is subject to the death penalty as one who has killed, attempted to kill, or intended that a killing take place or that lethal force be used.[6]

---

[6] There may be some cases in which the jury instructions would theoretically have permitted the jury to find the defendant guilty of a capital offense and sentence him to death without finding the *Enmund* factors, but in which the theory on which the case was tried and the evidence received leave no doubt that the jury's verdict rested on a finding that the defendant killed or intended to kill. For example, where a defendant conceded that he committed the killing and defended against the charge of murder only by claiming self-defense, a jury verdict of guilty would necessarily satisfy *Enmund* even if, for some reason, the trial court's instructions did not explicitly require a finding that the defendant killed, attempted to kill, or intended to kill. In such a case, a federal habeas court would be justified in treating the state courts' failure to make explicit *Enmund* findings as harmless beyond a reasonable doubt; the court would therefore simply deny the writ without requiring further proceedings in the state courts. Cf. *Ross* v. *Kemp*, 756 F. 2d, at 1499–1500 (Clark, J., concurring in part and dissenting in part).

## VI

The proceeding that the state courts must provide Bullock need not take the form of a new sentencing hearing before a jury. As indicated above, the Eighth Amendment does not require that a jury make the findings required by *Enmund.* Moreover, the sentence currently in force may stand provided only that the requisite findings are made in an adequate proceeding before some appropriate tribunal—be it an appellate court, a trial judge, or a jury.[7] A new hearing devoted to the identification and weighing of aggravating and mitigating factors is thus, as far as we are concerned, unnecessary.

Accordingly, the District Court should be directed to issue the writ of habeas corpus vacating Bullock's death sentence but leaving to the State of Mississippi the choice of either imposing a sentence of life imprisonment or, within a reasonable time, obtaining a determination from its own courts of the factual question whether Bullock killed, attempted to kill, intended to kill, or intended that lethal force would be used. If it is determined that Bullock possessed the requisite culpability, the death sentence may be reimposed. The judgment of the Court of Appeals is modified to this extent, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE BURGER, concurring.

Although I see no need for remanding for further findings in the State's courts, I join the Court's opinion. It is true that the Mississippi Supreme Court did not have *Enmund*'s

---

[7] Mississippi has adopted a post-*Enmund* capital sentencing statute, under which the task of determining whether the defendant killed, attempted to kill, intended to kill, or intended that lethal force be used is delegated to the jury, Miss. Code Ann. § 99–19–101(7) (Supp. 1985). Whether this provision has any application where, as in this case, trial occurred prior to the passage of the statute, is a matter of state law that we do not attempt to resolve.

findings explicitly in mind when it reviewed the sentence of death imposed on respondent Bullock, because the Mississippi courts had completed their review before *Enmund* was decided. Nevertheless, the Mississippi Supreme Court's opinion makes it clear that *Enmund*'s concerns have been fully satisfied in this case.

In rejecting respondent's claim that there was insufficient evidence to support his capital murder conviction because he "was an unwilling participant in the robbery-homicide," that court explicitly found "[t]he evidence is overwhelming that appellant was present, *aiding and assisting in the assault upon, and slaying of,* Dickson." *Bullock* v. *State,* 391 So. 2d 601, 606 (1980) (emphasis added), cert. denied, 452 U. S. 931 (1981). That court further rejected a claim that the death penalty was disproportionate to sentences imposed in similar cases, after again finding that "[t]he evidence is overwhelming that appellant was an active participant in the assault and homicide committed upon Mark Dickson." 391 So. 2d, at 614.

Surely these statements reflect a conclusion of the state court that respondent actively participated in the actual killing, which is far more than *Enmund* requires. In these circumstances, I see no need to expend finite judicial resources by remanding and calling for the Mississippi Supreme Court to tell us what it has already made clear, *i. e.,* that respondent's culpability more than satisfies any proportionality concerns dictated by *Enmund.*

JUSTICE BRENNAN, dissenting.

Although I join JUSTICE BLACKMUN's and JUSTICE STEVENS' dissents, I adhere to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U. S. 153, 227 (1976) (BRENNAN, J., dissenting). Accordingly, I would vacate the death sentence and remand the case so that the state court can determine what sentence—other than death—may be appropriate.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

Last Term, in *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985) (a case not even cited by the Court in its controlling opinion, *ante*, p. 376), we recognized institutional limits on an appellate court's ability to determine whether a defendant should be sentenced to death:

> "Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record. This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed '[those] compassionate or mitigating factors stemming from the diverse frailties of humankind.' When we held that a defendant has a constitutional right to the consideration of such factors, we clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses." 472 U. S., at 330–331 (citations omitted; interpolation in original).

That statement in *Caldwell* is not an abstract disquisition on appellate courts generally. It concerns, in particular, the institutional limits of the Supreme Court of Mississippi in capital cases. Today, the Court ignores those recently stated limits and holds that the Mississippi Supreme Court may be competent to make, on a paper record, the findings required by *Enmund* v. *Florida*, 458 U. S. 782 (1982)—that Crawford Bullock, Jr., killed, attempted to kill, or intended to kill Mark Dickson, and thus deserves to die. The Court reaches that result by paying lipservice to the constitutional significance of *Enmund* while relegating *Enmund* findings to a position of judicial afterthought. The nature of the *Enmund* findings, however, dictates who must make them and at what point in the sentencing process they must be

made. The Eighth Amendment requires that *Enmund* findings be made at the trial court level before the sentencer condemns a defendant to death. The Court's misreading of *Enmund* threatens a retreat from the constitutional safeguards on the capital sentencing process that the Court has acknowledged in the decade since *Gregg* v. *Georgia*, 428 U. S. 153 (1976).

## I

Bullock testified both at his trial and at his sentencing proceeding. He explicitly denied that he killed, attempted to kill, or intended to kill Dickson. See, *e. g.*, Tr. 956, 983, 996, 1190. The jury's verdict and sentence are entirely consistent under Mississippi law with Bullock's testimony. As the Court recognizes, that law and the trial court's instructions permitted the jury to convict him and to sentence him to death without finding any particular degree of personal participation in the killing. *Ante*, at 383–384.

The Court also recognizes that the Mississippi Supreme Court failed to make the required *Enmund* findings. That court affirmed Bullock's conviction and death sentence based on its view of Bullock's culpability under Mississippi's law of aiding and abetting, which establishes a threshold far below *Enmund*'s constitutional minimum. *Ante*, at 389–390. The Mississippi Supreme Court explicitly based its account of the crime on Bullock's written confession, see *Bullock* v. *State*, 391 So. 2d 601, 605, cert. denied, 452 U. S. 931 (1981), in which Bullock stated only that Tucker killed Dickson, and that he, Bullock, had no intention of robbing Dickson. Tr. 387–390. That confession provides no evidence that Bullock killed, attempted to kill, or intended to kill Dickson. Thus, the Court properly concludes that none of the required *Enmund* findings has been made.

## II

The central message of *Enmund* is that the death penalty cannot constitutionally be imposed without an intensely indi-

vidual appraisal of the "personal responsibility and moral guilt" of the defendant. 458 U. S., at 801.

"The focus must be on *his* culpability, . . . for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence,' *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978) (footnote omitted), which means that we must focus on 'relevant facets of the character and record of the individual offender.' *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976)." *Id.*, at 798 (emphasis in original).

See also *Eddings* v. *Oklahoma*, 455 U. S. 104, 110–112 (1982); *Lockett* v. *Ohio*, 438 U. S. 586, 603–604 (1978) (plurality opinion); *Gregg* v. *Georgia*, 428 U. S., at 199 (joint opinion).

Put simply, *Enmund* establishes a constitutionally required factual predicate for the valid imposition of the death penalty. Cf. *ante*, at 390. Like the statutory aggravating circumstances discussed in *Zant* v. *Stephens*, 462 U. S. 862 (1983), the *Enmund* findings "circumscribe the class of persons eligible for the death penalty." 462 U. S., at 878. Just as, absent the finding of a statutory aggravating circumstance, " '[a] case may not pass . . . into that area in which the death penalty is authorized' " under Georgia law, *id.*, at 872, quoting *Zant* v. *Stephens*, 250 Ga. 97, 100, 297 S. E. 2d 1, 4 (1982), so too, absent a finding of one of the *Enmund* factors, a case may not pass into that area in which the death penalty is authorized by the Eighth Amendment.

The Court agrees that it would be wrong for Mississippi to execute Bullock without first determining that he killed, attempted to kill, or intended to kill Dickson. See, *e. g.*, *ante*, at 378, 385, 386. But if that is so, then it was also wrong for the Mississippi jury to discharge "the truly awesome responsibility of decreeing death for a fellow human," *McGautha* v. *California*, 402 U. S. 183, 208 (1971), without first considering the fundamental issue of his personal culpability. By condemning Bullock to die, the jury announced

that he was not fit to live. This expression of the community's ultimate outrage, unaccompanied as it was by any finding that Bullock possessed the degree of culpability required by *Enmund*, involved the kind of deprivation of human dignity which the Eighth Amendment forbids. Cf., *e. g.*, *Trop* v. *Dulles*, 356 U. S. 86, 100–102 (1958) (plurality opinion); *Weems* v. *United States*, 217 U. S. 349, 366 (1910).

## A

The question of how to cure this constitutional violation remains. The Court holds that an adequate remedy for the absence of *Enmund* findings can be supplied by "any court that has the power to find the facts and vacate the sentence." *Ante*, at 386. I believe that, in this case, only a new sentencing proceeding before a jury can guarantee the reliability which the Constitution demands. But the Court's decision today goes beyond a simple determination of how to cure an error that has already occurred. It tells the States, in effect, that it is no error for a jury or a trial judge to say that a defendant should die without first considering his personal responsibility and moral guilt, as *Enmund* requires. By turning the jury or trial court's determination into what can be viewed only as a preliminary stage in the capital-sentencing process, the Court's holding poses the threat of diffusing the sentencer's sense of responsibility in the manner condemned in *Caldwell*. The Court thus ignores both the proper institutional roles of trial and appellate courts and the pragmatic and constitutional concerns with reliability that underlie those roles. In short, the Court's holding rests on an improper equation of the wholly dissimilar functions of finding facts and of vacating a sentence because no facts have been found. *Enmund* established a clear constitutional imperative that a death sentence not be *imposed* by a sentencer who fails to make one of the *Enmund* findings. The Court confuses this imperative with the guarantee it purports to

make today that a death sentence will not be *carried out* before someone makes an *Enmund* finding.

That this ignores a distinction with a constitutional difference is made clear by the Court's decisions in *Cole* v. *Arkansas*, 333 U. S. 196 (1948), and *Presnell* v. *Georgia*, 439 U. S. 14 (1978). In *Cole*, the Court reversed a state appellate decision that had affirmed the defendants' sentences by finding they had violated a different statutory provision from the one with which they had been charged. It recognized that the Due Process Clause requires that defendants "have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court." 333 U. S., at 202. In *Presnell*, the Court acknowledged that the "fundamental principles of procedural fairness" announced in *Cole* "apply with no less force at the penalty phase of a trial in a capital case than they do in the guilt-determining phase of any criminal trial." 439 U. S., at 16. It thus reversed a death sentence which the Georgia Supreme Court had affirmed on the basis of its own finding that evidence in the record would support a statutory aggravating circumstance that had not been found by the jury. Notably, in neither *Cole* nor *Presnell* did this Court consider whether the State Supreme Courts' evidentiary findings were *correct;* whether their findings were right was entirely irrelevant to the question whether the Due Process Clause gave them the power to make such findings. The Court's decision today gives a state appellate court *carte blanche* to engage in factfinding concerning issues that no one at trial thought to be relevant. Here, as the Court recognizes, "'the entire case was essentially tried on the theory . . . that it was not necessary, either for the felony murder conviction or for the sentence to death, to find that Bullock had either the intent to kill or any personal participation in the killing.'" *Ante*, at 384, quoting *Bullock* v. *Lucas*, 743 F. 2d 244, 248

(CA5 1984) (concurring opinion); see also, *e. g.*, Tr. 1155. The critical issue was never determined in the trial court.[1]

Far more than "[c]onsiderations of federalism and comity," *ante*, at 391, should prevent this Court, and other federal habeas courts, from examining trial transcripts and making *Enmund* findings themselves. Considerations of reliability provide a compelling reason for requiring state trial courts to address this issue in the first instance. And, with respect to the question of reliability, the Mississippi Supreme Court is in no better position than is this Court to determine Bullock's credibility.

The Court's conclusion that we should allow the States to adopt capital punishment schemes that depend on appellate factfinding because "it is by no means apparent that appellate factfinding will *always* be inadequate," *ante*, at 388, n. 5 (emphasis added), turns on its head the heightened concern with reliability that has informed our review of the death penalty over the past decade.[2] See, *e. g.*, *Caldwell* v. *Mississippi*,

---

[1] The Court's attempt to distinguish *Presnell* on the ground that *Spaziano* v. *Florida*, 468 U. S. 447 (1984), rejected the assumption that juries have equivalent constitutional roles in determining guilt or innocence and in determining capital sentences, see *ante*, at 387–388, n. 4, is misplaced. *Cole* and *Presnell* hold that the Due Process Clause requires that appellate courts review convictions and sentences "as [they] were determined *in the trial court.*" *Cole*, 333 U. S., at 202 (emphasis added). *Spaziano* simply held that the Constitution permits trial judges, rather than trial juries, to make sentencing determinations. See *infra*, at 401, and n. 3.

[2] The Court's reliance on *Sumner* v. *Mata*, 449 U. S. 539 (1981), is misplaced. There, the Court held that the presumption of correctness accorded state-court findings of fact under 28 U. S. C. § 2254(d) extends to appellate findings as well as trial-court findings. 449 U. S., at 545–547. But the presumption of correctness is defeated by a showing that "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing." 28 U. S. C. § 2254(d)(2). The question whether state procedures are "adequate" involves two distinct inquiries. The first is whether the procedure employed in a particular case in fact afforded the defendant a full and fair hearing. The second is whether the procedure itself comports with due process. Bullock raises both those

472 U. S., at 328–329; *California* v. *Ramos,* 463 U. S. 992, 998–999 (1983); *Beck* v. *Alabama,* 447 U. S. 625, 637–638 (1980); *Lockett* v. *Ohio,* 438 U. S., at 604 (plurality opinion); *Gardner* v. *Florida,* 430 U. S. 349, 358–359 (1977) (opinion announcing judgment); *Woodson* v. *North Carolina,* 428 U. S. 280, 305 (1976) (plurality opinion).   I believe that the Eighth Amendment not only requires that the sentencer make *Enmund* findings before it decides that a defendant must die, but also requires that the *Enmund* factfinder be present at the trial, to see and hear the witnesses.

The Court long has recognized the special competence of trial courts which formed the basis for *Caldwell*'s discussion of the "institutional limits on what an appellate court can do." 472 U. S., at 330.   In a variety of contexts, the Court has relied upon the New York Court of Appeals' explanation

questions: he claims that in his case the Mississippi Supreme Court failed to use adequate procedures for making *Enmund* findings, and that a procedure which places the responsibility for making *Enmund* findings on the Mississippi Supreme Court is inherently inadequate.   *Sumner* v. *Mata* does nothing to answer the latter question, because it assumes that the appellate court is constitutionally a proper factfinder.   In *Mata,* this Court explicitly acknowledged that the trial-court record on which the California Court of Appeal based its findings concerning the suggestiveness of a photographic lineup was "completely adequate" for that purpose.   449 U. S., at 543.   *Sumner* v. *Mata* therefore says nothing about how state-court findings are to be treated when the record on which they are based, by its very nature, is inadequate to permit factfinding in the first instance.

Moreover, the opinion in *Mata* does not concern itself with explaining when an appellate court is constitutionally incompetent to find facts.   That an appellate court is not always a proper factfinder is clear beyond doubt.   Surely, the Court would not read *Sumner* v. *Mata* to foreclose habeas relief in cases where an essential element of the offense was not found at trial.   Cf. *ante,* at 384.   In § 2254(d)(2)'s terms, a "factfinding procedure" that vested in appellate courts the responsibility for determining an element of the offense would not be constitutionally "adequate."   Similarly, I believe, the *Enmund* findings concern the kind of facts that can be found only by someone who has actually seen and heard the witnesses when they testified.

in *Boyd* v. *Boyd*, 252 N. Y. 422, 429, 169 N. E. 632, 634 (1930):

> "Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. . . . How can we say the judge is wrong? We never saw the witnesses. . . . To the sophistication and sagacity of the trial judge the law confides the duty of appraisal. . . . His was the opportunity, the responsibility and the power to decide."

See, *e. g.*, *Wainwright* v. *Witt*, 469 U. S. 412, 434 (1985) (quoting *Boyd*); *Marshall* v. *Lonberger*, 459 U. S. 422, 434 (1983) (same).

Our precedents are not to the contrary. Although we held in *Spaziano* v. *Florida*, 468 U. S. 447 (1984), that neither the Sixth nor the Eighth Amendment required jury sentencing in capital cases, we made that determination in the face of a Florida statute which "plac[ed] responsibility on the *trial* judge to impose the sentence in a capital case." *Id.*, at 465 (emphasis added). In the relevant respects, a trial judge in a capital case is more like a jury than he is like an appellate court. Like the jury, he has seen the witnesses, and is well positioned to make those "determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Wainwright* v. *Witt*, 469 U. S., at 428.[3]

---

[3] Every State with a death penalty statute has implicitly recognized this essential point, even though not all of them have explicitly held that *Enmund* findings must be made by the trial court. The seven States whose schemes involve judge sentencing all vest the power to impose sentence in a judge who actually has seen the presentation of evidence and confronted the defendant. See Ala. Code § 13A–5–46 (1982); Ariz. Rev. Stat. Ann. § 13–703 (Supp. 1985); Fla. Stat. § 921.141 (1985); Idaho Code § 19–2515 (Supp. 1985); Ind. Code § 35–50–2–9 (Supp. 1985); Mont. Code Ann. § 46–18–301 (1985); Neb. Rev. Stat. §§ 29–2520 and 29–2521

B

The Court's discussion of "the nature of our ruling in *Enmund*," *ante*, at 384, reveals a reliance on three premises: first, *Enmund* "does not impose any particular form of procedure upon the States," *ante*, at 386 (emphasis omitted); second, *Enmund* " 'does not affect the state's definition of any substantive offense, even a capital offense,' " *ante*, at 385, quoting *Reddix* v. *Thigpen*, 728 F. 2d 705, 709 (CA5), cert. denied, 469 U. S. 990 (1984); and, third, *Enmund* is a "substantive limitation on sentencing" amenable to traditional proportionality review, *ante*, at 386. None of these propositions justifies the Court's holding today.

That we have refused " 'to say that there is any one right way for a State to set up its capital sentencing scheme,' " *ante*, at 387, quoting *Spaziano*, 468 U. S., at 464, does not mean that there are no wrong ways. As has been shown, a capital-sentencing scheme that permits an appellate court to

(1979). No State has placed the sentencing power, as opposed to the power to review sentences, in an appellate court. Every State provides for an evidentiary sentencing hearing, to be conducted in front of the sentencing authority, be it judge or jury.

*Enmund* identified 17 States in which the then-existing death penalty statutes potentially countenanced the execution of defendants who neither killed, attempted to kill, or intended to kill: Arizona, California, Connecticut, Florida, Georgia, Idaho, Indiana, Mississippi, Montana, Nebraska, Nevada, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, and Wyoming. See 458 U. S., at 789, n. 5; *id.*, at 792, nn. 12 and 13. Since *Enmund*, seven of those States have addressed the issue and apparently have concluded that the sentencer must make *Enmund* findings before imposing sentence. See *State* v. *McDaniel*, 136 Ariz. 188, 199, 665 P. 2d 70, 81 (1983); *People* v. *Garcia*, 36 Cal. 3d 539, 556–557, 684 P. 2d 826, 835–837 (1984), cert. denied, 469 U. S. 1229 (1985); *Allen* v. *State*, 253 Ga. 390, 395, n. 3, 321 S. E. 2d 710, 715, n. 3 (1984), cert. denied, 470 U. S. 1059 (1985); Miss. Code Ann. § 99–19–101(7) (Supp. 1985); *State* v. *Stokes*, 308 N. C. 634, 651–652, 304 S. E. 2d 184, 195 (1983); *Hatch* v. *Oklahoma*, 662 P. 2d 1377, 1382–1383 (Okla. Crim. App. 1983); *State* v. *Peterson*, 287 S. C. 244, 248, 335 S. E. 2d 800, 802 (1985). Five others—Connecticut, Montana, Nebraska, Nevada, and South Dakota—have not yet considered cases raising an *Enmund* claim.

make *Enmund* findings sacrifices reliability needlessly to no discernible end, and cannot satisfy the Eighth Amendment.

That *Enmund* does not restrict the State's power to define offenses is equally beside the point. A State's decision to define a crime as "capital" cannot "automatically . . . dictate what should be the proper penalty," *Lockett* v. *Ohio*, 438 U. S., at 602 (plurality opinion), and does not empower the State to execute a defendant who neither killed, nor attempted to kill, nor intended to kill. In *Coker* v. *Georgia*, 433 U. S. 584 (1977), for example, Georgia's definition of rape as a capital offense did not dispose of the Eighth Amendment issue. Both JUSTICE O'CONNOR's dissent in *Enmund* and the Court of Appeals' opinion in *Reddix*—the authorities upon which the Court relies—recognize the distinction, which seems to elude the Court, between defining an offense and being entitled to execute a defendant. See *Enmund*, 458 U. S., at 810, and n. 19 (O'CONNOR, J., dissenting) (Enmund did not contest his conviction for felony murder; his "sole challenge is to the penalty imposed"); *Reddix*, 728 F. 2d, at 709 (the State may convict a defendant of a capital crime without requiring an instruction on intent; "*Enmund*, however, will 'bar a *death penalty*'" absent such an instruction, quoting *Skillern* v. *Estelle*, 720 F. 2d 839, 847 (CA5 1983) (emphasis in *Skillern*), cert. denied, 469 U. S. 873 (1984)). A State remains free to define felony murder as it wishes; but it can execute a felony murderer who has been sentenced to death only by a sentencer who has determined that he possesses the degree of culpability discussed in *Enmund*.

The Court also would justify its holding by reference to the discussion of Eighth Amendment principles of proportionality in *Solem* v. *Helm*, 463 U. S. 277 (1983). The Court's discussion mistakenly amalgamates review and essentially *de novo* factfinding. Certainly, the Court is correct that "the decision whether a sentence is so disproportionate as to violate the Eighth Amendment in any particular case . . . has long been viewed as one that a trial judge or an appellate

court is fully competent to make." *Ante,* at 386. But the Eighth Amendment demands more than that the reviewing court decide whether the sentencer has properly weighed the seriousness of the offense and the severity of the punishment. The Eighth Amendment binds the sentencer as well. The joint opinions in *Gregg* v. *Georgia,* 428 U. S. 153 (1976), *Proffitt* v. *Florida,* 428 U. S. 242 (1976), and *Jurek* v. *Texas,* 428 U. S. 262 (1976), all explicitly rested their approval of the capital-sentencing schemes before them on the *combination* of channeled factfinding by the sentencer and appellate review. In *Gregg,* an "important additional safeguard" was provided by the Georgia Supreme Court's review of "whether the evidence supports the jury's finding of a statutory aggravating circumstance," as well as by the exercise of comparative proportionality review. 428 U. S., at 198. In *Proffitt,* "meaningful appellate review" was provided because the appellate court had before it written findings justifying the imposition of the death penalty. 428 U. S., at 251. In *Jurek,* the jury had to make specific findings, which were then subject to appellate review. 428 U. S., at 269, 276. To permit States to collapse factfinding and review into one proceeding is to abandon one of the most critical protections afforded by every capital-sentencing scheme to which the Court previously has given its approval.

*Enmund* "insist[ed] on 'individualized consideration as a constitutional requirement *in imposing the death sentence,'"* 458 U. S., at 798 (emphasis added), quoting *Lockett* v. *Ohio,* 438 U. S., at 605, and not merely in reviewing the sentence imposed. The sentencer is not relieved of the duty to consider whether the severity of the defendant's crime justifies the death penalty by the availability of proportionality review. *Enmund* places a substantive limitation on a process that precedes proportionality review.

## C

This case demonstrates graphically why a trial-court sentencer must make the *Enmund* determination. Under

Mississippi law, "the jury is the sole player in the judicial process who may vote to send an accused to die." *Wiley* v. *State*, 449 So. 2d 756, 762 (Miss. 1984); see also *Williams* v. *State*, 445 So. 2d 798, 811 (Miss. 1984), cert. denied, 469 U. S. 1117 (1985). To the extent that *Enmund* places a substantive limitation on sentencing, then, Bullock is entitled to insist that the sentencing jury heed its limits. *Caldwell* suggests that to postpone Bullock's right to an *Enmund* determination is effectively to deprive him of that right because, in Mississippi, capital review is "conducted with a presumption of . . . correctness." *Wiley*, 449 So. 2d, at 762; see *Caldwell*, 472 U. S., at 331; see also Miss. Code Ann. § 99–19–105 (Supp. 1985). The Mississippi Supreme Court examines the record solely to see whether a reasonable jury *could* have concluded that Bullock killed, attempted to kill, or intended to kill, rather than whether Bullock in fact did any of those things. Saying that Bullock might have acted with the requisite culpability does not satisfy the constitutional requirement that Bullock actually have acted with that degree of blameworthiness.

*Hicks* v. *Oklahoma*, 447 U. S. 343 (1980), makes clear that the former inquiry is simply insufficient to satisfy due process. In *Hicks*, the Court vacated a sentence imposed, as Oklahoma law required, by a jury which had relied upon an invalid statutory provision despite the fact that the Court of Criminal Appeals had affirmed the sentence as within the permissible range. *Hicks* held that when a State vests the sentencing power in the trial jury, a defendant has "a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion." *Id.*, at 346. A state appeals court cannot reform a defendant's sentence, thus denying him the right actually to be sentenced by a jury "simply on the frail conjecture that a jury *might* have imposed a sentence equally as harsh as that [affirmed by the appellate court]. Such an arbitrary disregard of the petitioner's right

to liberty is a denial of due process of law." *Ibid.* (emphasis in original).

As for reliability, the Court buries in a footnote an acknowledgment that "the question whether the defendant killed, attempted to kill, or intended to kill might in a given case turn on credibility determinations that could not be accurately made by an appellate court on the basis of a paper record, cf. *Anderson* v. *Bessemer City*, 470 U. S. 564, 575 (1985); *Wainwright* v. *Witt*, 469 U. S. 412, 429 (1985)." *Ante*, at 388, n. 5. The Court fails to notice that this *is* that "given case": Bullock took the stand, at both the guilt and penalty phases of his trial, to deny having killed, having attempted to kill, or having intended to kill Dickson. See Tr. 956, 983, 996, 1190. I have read the trial transcript. Although I think the evidence is consistent with Bullock's claim that the killing of Mark Dickson resulted from a drunken brawl between Tucker and Dickson that tragically got out of hand, cf. *Bullock* v. *Lucas*, 743 F. 2d, at 248 (concurring opinion), I must concede that a jury or judge who saw Bullock testify might well think he lied. I fail, however, to see how an appellate court confidently could conclude, without any indication from anyone who actually saw him testify, that Bullock's account was so unworthy of belief that he was properly condemned to death.

Moreover, nothing in the Court's opinion suggests that this case is at all unusual in this respect.[4] To permit the States

---

[4] I assume that many capital defendants who neither killed, attempted to kill, nor intended to kill take the stand, at least at the sentencing hearing, since they know that if they convince the sentencer of their diminished level of personal culpability their lives will be spared. The considerations of federalism and comity identified by the Court are hardly best served by allowing the State to construct capital-sentencing schemes that require federal habeas courts to examine in every case the nature of the evidence presented in order to determine whether the State's regular capital-sentencing procedure is satisfactory. It is far better, it seems to me, to establish a bright-line rule requiring the findings to be made by the trial court, especially since the Court has failed to identify a single reason why a

to construct capital-sentencing schemes that by their very nature will be inadequate in cases such as this strikes me as an abdication of our responsibility under the Eighth Amendment to ensure that the system of capital punishment, as well as the imposition of the penalty on individual defendants, meets the Constitution's requirements.[5]

Here, Bullock had a legitimate expectation that the sentencing jury would consider his personal responsibility and moral guilt before deciding to send him to die. Under *Enmund*, the only way to guarantee that such consideration has been given is to require the sentencer to determine that the defendant either killed, or attempted to kill, or intended to kill. That a jury *might* or *could* have made such a determination hardly provides a guarantee that this jury *did*. Because I believe every defendant is entitled to that guarantee, I would vacate the death sentence and remand the case with instructions to provide Bullock with a sentencing hearing before a jury. Inasmuch as the majority refuses to take this essential step, I dissent.

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins, dissenting.

The justification for executing the defendant depends on the degree of his culpability — "what [his] intentions, expecta-

---

State legitimately could prefer to vest the factfinding function in an appellate court.

[5] The Court's refusal to "determine what factfinding procedures would be adequate in the particular case before us," *ante*, at 388, n. 5, strikes me as somewhat perverse. Although most of the cases we hear concern broad legal questions the resolution of which will affect many persons other than the actual parties, this should not blind us to the fact that our authority to reach those questions rests on the presence of a concrete case. The question as to what procedures would be adequate in this case is not, as the Court suggests, "hypothetical." *Ibid.* The believability of Bullock's testimony is the critical factor, and the credibility judgment can be made, in the first instance, only by someone who has seen him testify. If anything is "hypothetical," it is the Court's assumption that an appellate factfinding procedure that is clearly inadequate for the actual case before it will be adequate in hypothetical cases not before it.

tions, and actions were. American criminal law has long considered a defendant's intention—and therefore his moral guilt—to be critical to 'the degree of [his] criminal culpability,' *Mullaney* v. *Wilbur*, 421 U. S. 684, 698 (1975), and the Court has found criminal penalties to be unconstitutionally excessive in the absence of intentional wrongdoing." *Enmund* v. *Florida*, 458 U. S. 782, 800 (1982). The Eighth Amendment therefore precludes the imposition of a death sentence upon a defendant whose "crime did not reflect 'a consciousness materially more "depraved" than that of any person guilty of murder.'" *Id.*, at 800–801.

Because the finding of moral culpability required by *Enmund* is but one part of a judgment that "is ultimately understood only as an expression of the community's outrage—its sense that an individual has lost his moral entitlement to live," * I believe that the decision whether a death sentence is the only adequate response to the defendant's moral culpability must be made by a single decisionmaker, be it the trial court or the jury. The State of Mississippi has wisely decided that the jury is the decisionmaker that is best able to "express the conscience of the community on the ultimate question of life or death." *Witherspoon* v. *Illinois*, 391 U. S. 510, 519 (1968). As the Court points out, *ante*, at 383–384, a Mississippi jury has not found that respondent Bullock killed, attempted to kill, or intended that a killing take place or that lethal force be used. It follows, in my view, that a Mississippi jury has not determined that a death sentence is the only response that will satisfy the outrage of the community, and that a new sentencing hearing must be conducted if respondent is ultimately to be sentenced to die. In accordance with this reasoning, I would affirm the judgment of the Court of Appeals.

---

*\*Spaziano* v. *Florida*, 468 U. S. 447, 467 (1984) (STEVENS, J., concurring in part and dissenting in part).